UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

UNITED STATES OF AMERICA

      - against -

JOSEPH STERN,

               Defendant.
────────────────────────────────

16 Cr. 525 (JGK)

MEMORANDUM OPINION
AND ORDER

**JOHN G. KOELTL, District Judge:**

The defendant, Joseph Ezriel Stern, is charged in an indictment with one count of conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h) and three substantive counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 2. The defendant has moved to suppress recordings obtained pursuant to a court-authorized federal wiretap of the defendant's cellphone.

The defendant had also moved to suppress the defendant's post-arrest statements identifying the passcode to his cellphone and all evidence subsequently seized from that phone or evidence derived from such seizure. However, by stipulation endorsed on April 7, 2017, the Government agreed to forego using in its case-in-chief at trial any evidence obtained from the search and seizure of this cellphone and the parties agreed to further limitations on the use of evidence derived from such seizure. (See Docket No. 62.) Accordingly, only the motion to suppress the recordings obtained from the wiretap remain at issue.

In moving to suppress the wiretapped recordings, the defendant argues that the Government lacked probable cause to justify the original wiretap; that an evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) is required; and that the Government's alleged failure to minimize non-pertinent calls was so pervasive that it requires the suppression of all intercepted calls.

I.

To obtain a court order authorizing the interception of wire communications over cellphone number (347) 331-7700 (the "Target Cellphone"), the Government submitted the Affidavit of James J. Enders (the "Enders Affidavit") pursuant to 18 U.S.C. § 2518, a Special Agent with the Drug Enforcement Administration (the "DEA"), which was sworn to on March 2, 2015 before Judge Rakoff. (<u>See</u> Stern Ex. B.)  The Enders Affidavit made the following factual representations.

In or around December 2010, law enforcement agents executed two search warrants at two separate locations in Connecticut that resulted in the seizure of over 300 marijuana plants and the arrest of a confidential source ("CS-1").  CS-1 thereafter began cooperating with the DEA and provided information stating that, between 2009 and 2010, CS-1 arranged nine separate cash deliveries totaling over $4,000,000 to an individual named "Izzy" at 449 20th Street, Brooklyn, New York.  (Stern Ex. B at

18.) CS-1 personally conducted four such deliveries. (Stern Ex. B at 18.) CS-1 has proven to be reliable. His information was corroborated by a second confidential source ("CS-2") as well as by recorded conversations. (Stern Ex. B at 5 n.1.)

The affidavit represents that the defendant also goes by the name of "Izzy" or "EZ." (Stern Ex. B at 4.) It also states that the 449 20ᵗʰ Street address is registered to an entity called "Timeworks Worldwide LLC," and that the defendant had previously provided United Airlines with an email address, "EZY@TIMEWORKSNY.COM," that appears to be affiliated with Timeworks Worldwide LLC. (Stern Ex. B at 18-19.)

The Enders Affidavit goes on to describe a June 8, 2011 traffic stop of CS-2 in Illinois that resulted in the seizure of approximately $1,104,802 from the trunk of CS-2's vehicle, along with a handwritten telephone contact list that included a phone number assigned to an entity operating under the name "Timeworks International, Inc." The contact list identified "Izey" with that telephone number. (Stern Ex. B at 20.) CS-2 stated that he had taken custody of approximately $600,000 of the $1,104,802 from the defendant and his son in order to transport the currency to a narcotics dealer in Tijuana, Mexico, and that he knew the defendant by the name of "Iggy" or "Ziggy." (Stern Ex. B at 20-21.) CS-2 identified Stern from a photo array. Toll records also establish that on the day prior to the traffic

stop, CS-2's phone was in contact with the phone number assigned
to Timeworks International, Inc. approximately five times.
(Stern Ex. B at 20.)  Information provided by CS-2 was
independently corroborated by CS-1 as well as by recorded
telephone conversations.  (Stern Ex. B at 5 n.1.)

According to the Enders Affidavit, in November 2011, Agent
Enders and other DEA agents executed a search warrant at a
Brooklyn location, seized thirty pounds of marijuana and
approximately $571,000, and conducted a voluntary search of a
cellphone containing the number for the Target Cellphone
assigned to the contact "EZ." (Stern Ex. B at 21.)

The affidavit further states that on or about July 25,
2014, an undercover officer working for the DEA arranged to meet
with an individual who had previously disclosed that he was in
the business of trafficking narcotics.  (Stern Ex. B at 27-28.)
During that meeting, the narcotics trafficker provided the
undercover officer with $199,350 representing the proceeds of
narcotics sales.  According to toll records from on or about
July 21, 2014, the heroin trafficker's phone was in contact with
the Target Cellphone via text message one time and via voice
call five times.  (Stern Ex. B at 27.)

The Enders Affidavit also describes the details of a July
29, 2014 telephone call on the Target Cellphone between the
defendant and an undercover law enforcement officer who had

never previously conversed with the defendant. (Stern Ex. B at 21.) The undercover officer, speaking in a mix of Spanish and English, represented that he was calling on behalf of "Hugo, for 120," to which the defendant responded by stating that he would text the undercover officer an address. The defendant represented that he would "give to Mr. Hugo. . . You give me and I give to Mr. Hugo." (Stern Ex. B at 22-23.) The co-defendant in this case is Hugo Ruiz Flores. The defendant told the undercover officer: "You wait at the pharmacy Rite Aid in a car." The undercover officer then stated: "I give you bag . . . ok?" to which Stern responded: "OK." (Stern Ex. B at 22-23).

The affidavit states that the conversation appeared to discuss the logistics of dropping off a bag filled with $120,000 in cash to the defendant, and the defendant would then forward the cash to his co-defendant. (Stern Ex. B at 23.) Later that day, the Target Cellphone placed a call to the undercover officer to discuss the logistics of the transaction, in which the defendant stated that "the bag is for me and then I will tell Hugo how much it is." (Stern Ex. B at 24.) In a later call on the Target Cellphone, the defendant disclosed that the drop-off address was 449 20th street, which, according to the affidavit, "is associated with Timeworks Worldwide LLC and is the same address to which CS-1 delivered, or arranged for the

5

delivery, of approximately $4,000,000 in narcotics proceeds to an individual known to CS-1 as 'Izzy.'" (Stern Ex. B at 26.)

The Enders Affidavit describes another call between the undercover officer and the defendant on or about February 4, 2015. The undercover officer called the defendant on the Target Cellphone and stated in a mix of Spanish and English that he had "60 boxes" for the defendant, to which the defendant responded by providing the 449 20th Street address as the delivery location. (Stern Ex. B at 31-32.) The transcript shows the defendant stating: "Tomorrow I'm in my office between 9:15 until 5 in the afternoon." Agent Enders swears in his affidavit that it appeared that the "60 boxes" referred to the undercover officer's intention to deliver $60,000 in narcotics proceeds to the defendant in order to launder money. (Stern Ex. B at 32.) Agent Enders goes on to state that the delivery was to be made at the defendant's "place of business located at 449 20th Street, in Brooklyn, New York (i.e. the registered address of Timeworks Worldwide LLC. . . .)". (Stern Ex. B at 32-33.)

According to the affidavit, an analysis of toll records from August 7, 2014 through February 17, 2015 indicated that the Target Cellphone appeared to have communicated repeatedly with the phones of individuals suspected to be involved in laundering proceeds of narcotics. (Stern Ex. B at 33-40.)

On March 2, 2015, Judge Rakoff approved initial interceptions of wire communications over the Target Cellphone; Judge Wood reauthorized these interceptions and expanded the authorization to include electronic interceptions on March 31, 2015; and Judge Stein reauthorized wire interceptions for another 30 days on May 1, 2015, with the Government opting not to pursue a reauthorization of the electronic interceptions. (See Stern Ex. G.)

On March 2, 2015, minimization instructions were provided verbally and via e-mail to the case agent, monitoring agents, and translators working on intercepting the wire communications of the Target Cellphone. (See Gov't Ex. C.) Additional minimization instructions specific to electronic interceptions were also e-mailed on April 15, 2015 and verbally on April 16, 2015. (See Gov't Ex. D, E.) The Government also provided periodic reports to different judges regarding the status of the interceptions. (See Stern Ex. G.)

## II.

The defendant moves to suppress all recordings obtained from the wiretap of the Target Cellphone. The defendant claims that the Government lacked probable cause to justify the original wiretap on the Target Cellphone for which the defendant was the listed subscriber; that a Franks hearing is required to determine if Agent Enders recklessly disregarded the truth in

the affidavit he submitted to justify the wiretap; and that all wiretap recordings should be suppressed because the Government failed to minimize non-pertinent calls.

A.

Authorization to employ a wiretap requires probable cause that (1) an individual is committing, has committed, or is about to commit a particular enumerated offense; (2) particular communications concerning that offense will be obtained through the wiretap; and (3) the facilities subject to interception are being used in connection with commission of the offense.  18 U.S.C. § 2518(3); see also United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999).  The standard for probable cause for authorization to employ a wiretap is the same as the standard for probable cause to obtain a search warrant.  Diaz, 176 F.3d at 110.  That standard requires that the "totality of the circumstances" reflect a "fair probability that . . . evidence of a crime will be found . . . ."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Put another way, "[p]robable cause to issue a wiretap order exists when the facts made known to the issuing court are 'sufficient to warrant a prudent man in believing' that evidence of a crime could be obtained through the use of electronic surveillance."  United States v. Ruggiero, 824 F. Supp. 379, 398 (S.D.N.Y. 1993) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  The probable cause standard in this context is

not "especially demanding." United States v. Bellomo, 954 F.
Supp. 630, 636 (S.D.N.Y. 1997); see also United States v. Scala,
388 F. Supp. 2d 396, 401 (S.D.N.Y. 2005) ("Probable cause is not
a particularly demanding standard.").

In assessing probable cause, an affidavit submitted to
support a wiretap application "must be read as a whole, and
construed in a realistic and common-sense manner . . . . In
other words, a court must look at the snowball, not the
individual snowflakes." Scala, 388 F.Supp.2d at 401-02
(internal quotation marks and citations omitted).

A reviewing court owes great deference to the prior
findings of an issuing judicial officer that probable cause
exists. See, e.g., United States v. Wagner, 989 F.2d 69, 72 (2d
Cir. 1993); United States v. Santiago, 185 F.Supp.2d 287, 288
(S.D.N.Y. 2002); United States v. Gangi, 33 F.Supp.2d 303, 306
(S.D.N.Y. 1999); see also United States v. Concepcion, 579 F.3d
214, 217 (2d Cir. 2009). The standard of review in this context
is whether the issuing judicial officer had a "substantial
basis" for the finding of probable cause. E.g. Gates, 462 U.S.
at 236; Wagner, 989 F.2d at 72. Thus, wiretap orders are
presumed valid, and any doubts as to the existence of probable
cause are resolved in favor of upholding the authorization. See
United States v. Ambrosio, 898 F. Supp. 177, 181 (S.D.N.Y.

9

1995); see also United States v. Salas, No. 07-cr-557 (JGK), 2008 WL 4840872, at *3 (S.D.N.Y. Nov. 5, 2008).

A review of the Enders Affidavit plainly indicates that, based on the totality of the circumstances, probable cause existed and there was therefore a sufficient basis to justify a wiretap in this case. The affidavit describes a confidential source who had arranged nine separate cash deliveries -- four of which were conducted personally by the confidential source -- to the defendant's office 449 20th street in Brooklyn. Another confidential source who was found with over $1.1 million in cash disclosed that he had received $600,000 of this amount from the defendant. The confidential sources had direct knowledge of the transactions and there was corroboration that the confidential sources were reliable. The affidavit also details two separate seizures, one where large amounts of cash were found, and one where over thirty pounds of marijuana were found, and where individuals at the scenes of the seizures had the Target Cellphone number. Moreover, the affidavit describes a number of communications between suspected drug traffickers and the Target Cellphone in 2014 and 2015, including numerous communications between the Target Cellphone and a known heroin trafficker, followed up by the delivery shortly thereafter of $199,350 by the trafficker to an undercover officer. The affidavit further provides transcripts of cold calls placed by an undercover

officer to the Target Cellphone that appear to discuss the logistics of cash deliveries.  The totality of the descriptions within the affidavit plainly reflect more than a fair probability that evidence of a crime would be found upon the authorization of a wiretap on the Target Cellphone.  See Gates, 462 U.S. at 238.

The defendant argues that the affidavit was intentionally and recklessly misleading because it failed to mention that the defendant was employed as a salesman at TimeWorks International Inc.  The defendant argues that understanding that the defendant worked at Timeworks would counterbalance the implication that the receipt of large amounts of cash at that location was evidence of money laundering.  The argument is baseless.  The affidavit refers to Timeworks International numerous times, discloses the defendant's email address as "EZY@TIMEWORKSNY.COM," and quotes the defendant as referring to the address of Timeworks International Inc. as "my office." Agent Enders further explains that the delivery was to be made "at Stern's place of business."  A reasonable reading of the affidavit makes clear that the defendant was employed at TimeWorks International, Inc.  Moreover, further information about the defendant's status as a salesman at Timeworks International Inc., would do nothing to alter the conclusion that the affidavit established probable cause.  See Franks, 438

U.S. at 171–72 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."). While Stern objects that the Enders Affidavit referred to Timeworks as a "front company," information about any legitimate activities of Timeworks would not undercut the showing of probable cause. The Enders Affidavit itself explains: "[N]arcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions or domestic businesses in an attempt to make their narcotics proceeds appear to be from legitimate sources and to move those proceeds through the financial system into the countries where narcotics are manufactured." (Stern Ex. B at 16.)

The defendant also contends that information obtained from two confidential sources who stated that they had personally received or delivered cash proceeds from the defendant was insufficient to support probable cause because the information was stale. The defendant argues that the information provided by these confidential sources was stale because it involved events that allegedly occurred most recently in 2011.

But dissecting the affidavit in such a way would be improper because it would fail to read the affidavit as a whole and construe it in a "realistic and common-sense manner."

Scala, 388 F. Supp. 2d at 401.  The powerful evidence from contacts between two separate confidential sources and the defendant in 2010 and 2011 was updated by incriminating telephone calls with the defendant in 2014 and 2015.  The affidavit describes repeated contacts between the Target Cellphone and suspected drug traffickers, and transcripts of calls placed by undercover officers in 2014 and 2015 in which the defendant appears to lay out the logistics of money drop-offs to his Brooklyn office.

        The defendant argues that the transcripts of these calls placed by an undercover officer are unreliable, because they were conducted in a mix of Spanish and English thereby causing confusion on the part of the defendant.  But the recordings actually reveal that the defendant proficiently communicated with the undercover officer in Spanish and that he understood the import of these calls.  (See Gov't Ex. A and B (audio recordings)).  And while the defendant argues that the calls do not hint at an illegal source of funds and that the calls could in fact be related to cash deliveries for legitimate watch sales, nowhere on these calls are watches ever discussed.  Instead, the substance of these calls between the defendant and a complete stranger appear only to refer to dollar amounts of cash, and the address where such amounts should be delivered.

The content of these calls must be viewed in tandem with the information from sources who had allegedly previously delivered and received narcotics proceeds from the defendant, the existence of numbers associated with the defendant on the phones of individuals who were found with large amounts of cash and drugs, and the toll records establishing repeated communications between the Target Cellphone and suspected drug traffickers. When the affidavit is read holistically, the "totality of the circumstances" reflect a "fair probability that . . . evidence of a crime [would] be found." Gates, 462 U.S. at 238 (1983). It is plain that the affidavit satisfied the standard for probable cause, which, in the context of wiretap authorizations, is not "especially demanding." Bellomo, 954 F. Supp. at 636. The defendant has not provided a basis to disturb the presumptive validity of a previously authorized wiretap. See Ambrosio, 898 F. Supp. at 181. Accordingly, the defendant's argument that the Enders Affidavit failed to establish probable cause is without merit. Similarly, the defendant's request for a Franks hearing is denied.

B.

The defendant argues that the Government did not comply with the statutory minimization requirement for the wiretaps, such that all wiretapped communications should be suppressed.

14

The statute requires that interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). The statutory minimization requirement "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." Scott v. United States, 436 U.S. 128, 140 (1978). Compliance with the minimization requirement is measured by the reasonableness of the surveilling agent's conduct, which is evaluated using an ad hoc analysis of the facts surrounding the particular interception. Id. at 139. "[T]he mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute . . . . [N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated." United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903 (1974); see also United States v. Ianniello, 621 F. Supp. 1455, 1471 (S.D.N.Y. 1985) (Weinfeld, J.) ("It is common, of course, for conversations to treat more than one subject, and entirely possible for such dialogues to be comprised of discussion of innocent matters, interspersed with topics of a criminal nature. The statutory requirement of minimization does not mean that

only communications exclusively devoted to criminal subjects may be intercepted.").

The minimization requirement generally does not extend to calls lasting two minutes or less. See Bynum, 485 F.2d at 500 (calls lasting less than two minutes eliminated from consideration of minimization requirement in case of "wide-ranging criminal activity"); see also Drimal v. Tai, 786 F.3d 219, 225-26 (2d Cir. 2015) (noting that the "reasoning in Bynum . . . can be read to suggest a presumption that calls less than two minutes long need not be minimized" but cautioning that "whether the two-minute presumption applies is a fact-specific determination").

The percentage of calls minimized is not dispositive of whether the statutory minimization requirement was satisfied. Indeed, in Scott, 436 U.S. at 132, pursuant to a wiretap order with a minimization requirement, "virtually all of the conversations [over the tapped phone] were intercepted while only 40% of them were shown to be narcotics related." The Supreme Court held that the wiretap evidence should not be suppressed, explaining that the minimization inquiry entailed "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." Id. at 135-37; see also Salas, 2008 WL 4840872, at *6-7.

"[C]ourts have identified several measures which the
government can take to increase likelihood of compliance with
§ 2518(5): (1) maintenance of monitoring logs; (2) judicial
supervision of the progress of the surveillance; (3) provision
of written and oral instructions to monitoring personnel
regarding the legal requirements for minimization; (4) requiring
all monitoring personnel to read the court orders and
applications, and posting of the minimization instructions,
court orders and applications at the monitoring plant; and (5)
supervision by the prosecutor." Salas, 2008 WL 4840872, at *8
(citation omitted); see also United States v. Zemlyansky, 945 F.
Supp. 2d 438, 477 (S.D.N.Y. 2013).  If the Government can make a
prima facie showing that it undertook steps to increase the
likelihood of compliance with § 2518(5), the burden shifts to
the defendant to show that a substantial number of non-pertinent
conversations were nevertheless unreasonably intercepted.  See
Zemlyanksy, 945 F. Supp. 2d at 477.

Here, the Government made reasonable efforts to comply with
§ 2518(5).  The defendant does not dispute that the Government
maintained monitoring logs, but attempts to argue that the
session number identifiers used to identify calls cannot be
relied upon because certain session numbers previously used in
March recordings were repeated to identify calls in May.  But
the defendant does not dispute that these repeated session

numbers can be easily distinguished from each other based on the dates of those calls.  (See Stern Ex. J.)  Moreover, the wiretaps were judicially supervised through the Government's provision of periodic status reports. (See Stern Ex. G.)  And the Government made efforts to ensure that monitoring personnel received written and oral instructions regarding the legal requirements related to minimization by a supervising prosecutor, and it appears that the minimization instructions were posted at the monitoring plant and signed by the monitoring agents (see Gov't Ex. C, D, E.)  The Government has therefore made a prima facie showing it undertook steps to increase the likelihood of compliance with § 2518(5).  See Salas, 2008 WL 4840872, at *8.

The defendant argues that a substantial number of non-pertinent conversations were nevertheless unreasonably intercepted.  Of the 1,822 total intercepted calls, the defendant focuses on only 58 calls that were over two minutes in duration that were non-pertinent and that the Government did not minimize. (See Stern Ex. I.)[1]

But as the Government points out, the failure to minimize some of these calls was reasonable because at the time of

---

[1] The defendant also points out that there were 61 non-pertinent calls that exceeded two minutes that were minimized.  (See Stern Ex. H.)  But this is evidence of appropriate minimization not a failure to minimize.

interception, the calls could have been relevant to the

investigation.  These calls involved discussions regarding funds

and the defendant's collection of payments for watches that

could be relevant to suspected money laundering activity (see,

e.g., Stern Ex. I, session numbers 108, 180, 182, 197, 202, 595,

1175, 1509, 1529, 1580, 120 (May 20, 2015)); calls with airlines

that could be relevant for the purposes of making cash

deliveries at watch trade shows (see, e.g., Stern Ex. I, session

numbers 1892, 1893, 1894); discussions between suspected co-

conspirators, including between the defendant and another named

target of the interception (see, e.g., Stern Ex. I, session

numbers 73, 1235).[2]  In a money laundering investigation where

the suspected unlawful activity is concealing or disguising the

nature or source of financial proceeds, these calls were

"ambiguous in nature, making characterization virtually

impossible until the completion of these calls."  See Scott, 436

U.S. at 142.

Putting these calls aside, only 42 of the 1822 intercepted

calls were non-pertinent, over two minutes in length and not

minimized, which strongly suggests that the minimization for the

---

[2] While the Government claims that session numbers 605, 609, and
627 are pertinent because they reflect the defendant's
attendance at a trade show in Las Vegas, it is not clear why
those calls are pertinent to the investigation.  (See Stern Ex.
I.)

wiretap was reasonable in totality.  See Zemylanksy, 945 F. Supp. 2d at 480 (concluding minimizations were reasonable in totality when "[t]he Government monitored 3,747 calls in this wiretap, and only a small fraction of the calls -- short of one hundred -- were non-pertinent, over two minutes in length, and not minimized"); United States v. Marroquin-Corzo, No. 10-CR-892 (DAB), 2012 WL 3245473, at *9 (S.D.N.Y. Aug. 7, 2012) (noting that the defendant's failure to "contest the reasonableness of the monitoring of 98 percent of the monitored calls . . . weighs heavily in favor of finding the minimization efforts here were reasonable ").  Moreover, the Government has agreed not to introduce at trial any of the 58 calls not specifically cited by the Government in its submissions.

In sum, "the Government's minimization, when viewed as a whole, was . . . not unreasonable." Zemlyanksy, 945 F. Supp. 2d at 478-82.  Accordingly, the defendant's motion to suppress all calls from the entire wiretap is without merit.  See id. at 481-82 (collecting cases, describing a remedy of total suppression as "drastic and excessive," and noting that "[t]otal suppression would . . . be unprecedented in this Circuit").  The defendant's motion to suppress all recordings as a result of the alleged failure to minimize is denied.

CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the reasons explained above, the defendant's motion is **denied,** and the defendant's request for a <u>Franks</u> hearing is **denied.**  The Clerk is directed to **close Docket Nos. 42 and 57.**

**SO ORDERED.**

**Dated:**    **New York, New York**
         **April 22, 2017**

         _____/s/_____
              **John G. Koeltl**
         **United States District Judge**