UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
UNITED STATES OF AMERICA,

        - v.-

JOSEPH EZRIEL STERN,

              Defendant.
------------------------------------

16-cr-525 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

On May 26, 2017, the jury in this case found the defendant, Joseph Ezriel Stern, guilty of one count of a conspiracy, in violation of 18 U.S.C. § 1956(h), to commit concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); international concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and monetary transaction money laundering, in violation of 18 U.S.C. § 1957(a). The jury also found Stern guilty of three substantive counts of concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. The defendant now moves pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal. For the reasons explained below, the motion is **denied**.

I.

There was sufficient evidence introduced at trial from which the jury could have found as follows.

Stern worked in sales at TimeWorks, a wholesale watch dealer in Brooklyn, New York. In that capacity, Stern conducted legitimate business with watch dealers across the country and internationally. However, Stern also conducted non-traditional transactions with two watch dealers located in Mexico, Hugo Ruiz-Flores and Luis Zuniga-Ramos. Hugo Ruiz-Flores was a cooperating witness for the Government at trial. In certain of these transactions, Ruiz-Flores and Zuniga-Ramos would "purchase" luxury watches from Stern. However, rather than pay with a credit card, check, bank note, or money order, Ruiz-Flores and Zuniga-Ramos would compensate Stern by arranging for third parties to deliver to him large quantities of cash. Stern, or TimeWorks, received a commission for this service.

Through this structure, Mexican drug dealers --- Ruiz-Flores's and Zuniga-Ramos's clients in Mexico --- were able to convert the cash they received from illicit drug sales in the United States into luxury watches that could be transferred to Mexico without the scrutiny of financial institutions or law enforcement authorities. Over the years, Stern allegedly helped convert over a million dollars in drug money into luxury watches that were sent to Mexico on behalf of drug dealers. See Tr. at 524.

Donna Deberry testified at trial about her participation in this scheme. Deberry's boyfriend, Carlton Powell, was a

2

marijuana dealer. Tr. at 452-53. Powell worked for a drug dealer who Deberry knew as "Phil." Tr. at 454. The jury heard testimony from which they could have inferred that "Phil" was Filiberto Rascon, a client of Ruiz-Flores in Mexico. See, e.g., Tr. at 454, 505-510, 604. On March 19, 2015, Powell, at the direction of "Phil," directed Deberry to deliver the cash proceeds from the sale of 25 pounds of marijuana to an address in Brooklyn. Tr. at 463-65. The address Powell gave Deberry was the address for TimeWorks, and the phone number he told Deberry to call to coordinate the delivery was Stern's phone number. See Tr. at 468; GX 123-T. The cash consisted of bundles of bills in denominations ranging from one dollar to one hundred dollars. Tr. at 464. Deberry traveled from her home in the Bronx, New York, to TimeWorks in Brooklyn. When Deberry arrived at TimeWorks, Stern took her inside. Tr. at 470. Once inside, Stern took the cash, contained in a plastic bag, without asking what it was for or whom it was from. Id. That same day, Stern agreed to make an international wire transfer of approximately $126,000 to a Swiss watch dealer on behalf of Ruiz-Flores. GX 130-T. The Deberry transaction was the basis for the substantive charge of concealment money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 in Count Four of the Indictment.

Elias Padilla also testified at trial. Padilla, who lived in the Bronx, New York, received heroin and cash from a drug

3

dealer in Mexico called El Gordo. Tr. at 260-262. Padilla
testified that in March 2015, El Gordo directed him to deliver
$100,000 in cash to Stern, whom El Gordo referred to as "EZ."
Tr. at 264-66. Although Stern never actually received that
money, the Government introduced wiretapped conversations
showing that Stern agreed to pick up the cash from Padilla in
the Bronx on behalf of Zuniga-Ramos, only to turn back when he
became afraid and Zuniga-Ramos advised him to abort the pickup,
in part because Zuniga-Ramos was arranging the pickup as a
"favor" for someone else. GX 121-T; GX 133; GX 134-T.

Steven John also testified to carrying drug money to Stern.
Tr. at 895. John obtained Stern's phone number from Ramon, who
provided him with heroin and cocaine. Tr. at 890. In or around
November 2014 and early 2015, Ramon directed John to deliver
large quantities of cash derived from the sale of heroin
and cocaine --- $100,000 on the first trip and $200,000 on the
second --- to Stern at TimeWorks. Tr. at 891-99. John drove to
Brooklyn from Maryland by way of the Verrazano-Narrows Bridge.
Id. Stern accepted these cash deliveries outside TimeWorks
without inquiring what the money was for or whom it was from.
Tr. at 896. The cash was packaged in thousand-dollar bundles
with bills that ranged from twenties to hundreds. Tr. at 899.
The John transactions were the basis for the substantive charges
of concealment money laundering in violation of 18 U.S.C.

§§ 1956(a)(1)(B)(i) and 2 in Counts Two and Three of the Indictment.

The Government introduced evidence demonstrating that Stern was willing to accept large cash deliveries from total strangers. See Tr. at 470, 896, 899. Not only did Stern accept the cash from Deberry and John without asking any questions, Stern also agreed to accept $120,000 from Agent Luna of the FBI at a Rite-Aid pharmacy when Agent Luna called posing as a money launderer. GX 100; Tr. at 320. In one e-mail exchange, Stern lamented receiving phone calls from unknown numbers "that are not listed on the stock exchange. I don't know who's calling me." GX 231-T.

The Government also introduced evidence of Stern's apprehension about these transactions. Stern took certain precautions when completing these transactions. For example, he used code words to refer to cash in his phone conversations and e-mails, referring to the money as "flowers," "beautiful roses," "packages," "boxes," or "papers." In e-mails between Stern and Ruiz-Flores, Stern described fearing arrest by the police, GX 231-T, and conveyed that meeting couriers was "horribly scary." GX 241-T. Stern told Ruiz-Flores that Ruiz-Flores's cash payments would often be delivered late at night by "scary people" in non-traditional business locations, such as out on the street or in parking lots. GX 231-T; GX 241-T. Stern also

described that his boss, Jacob, "would kill" him if he discovered the transactions. GX 231-T. Stern also asked Ruiz-Flores not to deliver cash to Stern's son, Michael, but rather to "keep Michael out of it." Tr. at 574.

II.

To succeed on a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the defendant must show that no rational trier of fact, viewing the evidence in the light most favorable to the Government, could have found the defendant guilty beyond a reasonable doubt of the essential elements of the crimes charged. United States v. Desena, 287 F.3d 170, 176 (2d Cir. 2002). A defendant making an insufficiency claim "bears a very heavy burden." Id. at 177; see also United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir. 1991) (collecting Second Circuit cases).

In considering the sufficiency of the evidence, the Court must "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The Court must analyze the pieces of evidence "not in isolation but in conjunction," United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each

element, as each fact may gain color from others." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," the Court must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." Autuori, 212 F.3d at 111 (internal citation omitted). Thus, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). The jury's verdict "may be based entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995); see also United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); Macklin, 927 F.2d at 1277; United States v. Arroyo, No. 12-cr-552, 2013 WL 227733, at *2 (S.D.N.Y. Jan.22, 2013), aff'd, 2015 WL 264640 (2d Cir. Jan. 22, 2015); United States v. Tavarez, No. 13-cr-947 (JGK), 2015 WL 1137550, at *2–3 (S.D.N.Y. Mar. 12, 2015), aff'd, 648 F. App'x 16 (2d Cir. 2016).

### III.

### A.

The defendant argues that he is entitled to a judgment of acquittal on Count One. The defendant contends that the single conspiracy to commit money laundering charged in Count One of

the Indictment was prejudicially duplicitous because the Government's evidence at trial actually proved multiple conspiracies, not the single conspiracy charged in the Indictment. See Dkt. No. 114 at 1.[1] The defendant also argues that the Court should have given the jury a "multiple conspiracies" instruction. See Dkt. No. 84.

"The question whether the proof establishes a single or multiple conspiracies is an issue of fact 'singularly well-suited to resolution by the jury.'" United States v. Potamitis, 739 F.2d 784, 787 (2d Cir. 1984) (quoting United States v. McGrath, 613 F.2d 361, 367 (2d Cir. 1979)); United States v. Johansen, 56 F.3d 347, 350 (2d Cir. 1995). "The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan. The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-

---

[1] The defendant claims his motion is based on the contention that the conspiracy count is "prejudicially duplicitous for charging multiple conspiracies in a single count." But the defendant never moved to dismiss Count One on the grounds it was duplicitous, and the gist of the defendant's argument is not that the Indictment charged multiple conspiracies in the same count but rather that the proof showed multiple conspiracies and not the single conspiracy charged in Count One. In any event, Count One is not duplicitous and any claim of duplicity would require a showing of prejudice, which, as explained in the text, has not been shown. See United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001); United States v. Murray, 618 F.2d 892, 897-98 (2d Cir. 1980).

purposes." United States v. Maldonado-Rivera, 922 F.2d 934, 963
(2d Cir. 1990) (internal citations omitted).

A "single conspiracy may encompass members who neither know
one another's identities, nor specifically know of one another's
involvement." United States v. Sureff, 15 F.3d 225, 230 (2d Cir.
1994) (citations omitted); United States v. Vanwort, 887 F.2d
375, 383 (2d Cir. 1989) (members of conspiracy need not
"'conspire directly with every other member of it, or be aware
of all acts committed in furtherance of the conspiracy, or even
know every other member'") (citations omitted); United States v.
Martino, 664 F.2d 860, 876 (2d Cir. 1981) ("Given the members'
conscious participation in . . . a collective venture, a single
conspiracy does not become multiple conspiracies merely because
a particular member does not know the identities of some other
members."). Neither changing membership nor different time
periods of participation by various coconspirators precludes the
existence of a single conspiracy, "especially where the activity
of a single person was 'central to the involvement of all.'"
United States v. Eppolito, 543 F.3d 25, 48 (2d Cir. 2008)
(quoting United States v. Langford, 990 F.2d 65, 70 (2d Cir.
1993)); United States v. Jones, 482 F.3d 60, 72 (2d Cir. 2006)
("Changes in membership, differences in time periods, and/or
shifting emphases in the location of operations do not
necessarily require a finding of more than one conspiracy."). A

single conspiracy "is not transposed into a multiple one simply by the lapse of time, change in membership, or a shifting emphasis in its locale of operations." United States v. Cambindo Valencia, 609 F.2d 603, 625 (2d Cir. 1979).

Despite the existence of multiple groups within an alleged conspiracy, the Second Circuit Court of Appeals has considered them to be:

> [P]art of one integrated loose-knit combination in instances where there existed 'mutual dependence and assistance' among the spheres [of operation], a common aim or purpose among the participants, or a permissible inference, from the nature and scope of operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.

United States v. Bertolotti, 529 F.2d 149, 154 (2d Cir. 1975) (internal citations omitted). Multiple conspiracies, by contrast, exist where the evidence shows separate networks that operate independently of each other. United States v. Alkins, 925 F.2d 541, 554 (2d Cir. 1991).

In this case, the Government alleges the defendant was the hub of a classic "hub-and-spoke" conspiracy. Gov't Mot. at 15. "In a hub-and-spoke (or 'wheel') conspiracy, one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor." United States v. Ulbricht, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (citing Kotteakos v. United States, 328 U.S. 750, 754–55

(1946)). Proving a single conspiracy in such situation requires the Government to show there was a "rim" around the spokes --- in other words, that the spokes were coconspirators with one another. See Kotteakos, 328 U.S. 750 at 755. The existence of a connecting rim "depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy." United States v. Manarite, 448 F.2d 583, 589 (2d Cir. 1971).

A jury may also find a single conspiracy where "the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment," and the defendant participated in that enterprise "with a consciousness as to its general nature and extent." United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993) (internal quotation marks and citation omitted).

There was ample evidence from which the jury could have found that Stern engaged in a single conspiracy with others --- particularly Ruiz-Flores and Zuniga-Ramos --- whereby he was the hub of the money laundering conspiracy that transformed the proceeds of illegal drug sales in the United States into watches to be transferred to Mexico. The defendant provided a common service for both Ruiz-Flores and Zuniga-Ramos and even for others that he did not know, as evidenced by his willingness to

deal with Agent Luna, who posed as a money launderer. The goal
and means of each of the participants was the same, and each of
the participants knew that other participants were involved in
the process. Couriers whom Stern had never met before were the
intermediaries for both Ruiz-Flores and Zuniga-Ramos. There was
also evidence that both Ruiz-Flores and Zuniga-Ramos knew that
others were using Stern's services as the hub of the conspiracy.
See, e.g., GX 291 (Stern to Zuniga-Ramos: "It was not yours it
was Hugo"); GX 236-T (Stern to Ruiz-Flores: "Somebody called me
he says he is coming from Boston . . . is that for you??"); see
also United States v. Dominguez-Gabriel, 511 F. App'x 17, 19 (2d
Cir. 2013) (no showing of multiple rather than the two charged
single distribution and importation conspiracies where "there
was a common goal served by various schemes that were
interdependent by virtue of [the appellant's] place at their hub
and the use of overlapping core participants and similar methods
of operation.").

The defendant contends that his interactions with Zuniga-
Ramos established a separate conspiracy because Ruiz-Flores and
Zuniga-Ramos were actually "competitor Mexican watch dealers"
who "stood to benefit if the other had not existed." Dkt. No. 84
at 2. But the fact that Zuniga-Ramos and Ruiz-Flores competed in
selling watches in no way undercuts their common purpose of
laundering cash from the sale of illicit drugs and moving those

12

proceeds to Mexico for their "clients." This situation is similar to that in Sir Kue Chin, where the defendant obtained heroin from separate sources. In that case, the Court of Appeals for the Second Circuit held that "[t]he evidence supported the conclusion that [the defendant] was consciously acting as part of a single conspiracy of which he, himself, was the hub." United States v. Sir Kue Chin, 534 F.2d 1032, 1035 (2d Cir. 1976).

Moreover, the defendant's argument of alleged multiple conspiracies is not a basis for acquittal because there has been no showing of any prejudice at all. If the proof had shown multiple conspiracies, rather than the single conspiracy charged in the Indictment, "[t]he true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused." United States v. Miley, 513 F.2d 1191, 1207 (2d Cir. 1975) (quoting Berger v. United States, 295 U.S. 78, 82 (1935)) (internal quotation marks omitted); see Ulbricht, 31 F. Supp. 3d at 552 ("Where an indictment charges a single conspiracy and the evidence later shows multiple conspiracies, the court will only set aside a jury's guilty verdict due to the variance if the defendant can show 'substantial prejudice'") (citation omitted).

"It may generally be conceded that the possibility of prejudice resulting from a variance increases with the number of

defendants tried and the number of conspiracies proven."
Bertolotti, 529 F.2d at 156 (citations omitted); see also United
States v. Alessi, 638 F.2d 466, 475 (2d Cir. 1980) (noting that
a prejudicial variance becomes more likely as the number of
improperly joined defendants increases).

In this case, there was only a single defendant. All of the
evidence was properly introduced against the defendant, and the
defendant has pointed to no evidence that would not properly
have been introduced if the conspiracy charge were drafted more
narrowly. The evidence all related to the defendant's activities
and not to the activities of a remote participant. See Dkt. No.
146 at 8 (defense counsel acknowledging all evidence properly
admitted); see also Sir Kue Chin, 534 F.2d at 1035 (no prejudice
shown where evidence of the alleged second conspiracy would have
been admissible to show the appellant's intent with respect to
the other conspiracy).

Finally, the defendant argues that the Court should have
given a "multiple conspiracies" charge. There is no merit to
that argument. The Court properly instructed the jury that, to
find the defendant guilty of Count One of the Indictment, the
Government must prove beyond a reasonable doubt "the existence
of the conspiracy charged in the Indictment" and that the
"defendant knowingly and willfully became a member of the
conspiracy charged in the Indictment, that is, with the intent

to commit an object of the charged conspiracy." Tr. at 1265. That charge was plainly proper and there was no basis to give a "multiple conspiracies" charge.

A "multiple conspiracies" charge is generally "not appropriate in the trial of a single defendant." Leonard B. Sand et al., Modern Federal Jury Instructions, Pub. No. 485 Rel. No. 69B (2016); United States v. Corey, 566 F.2d 429, 431 n.3 (2d Cir. 1977) ("Even if there were two conspiracies, . . . the fact that only a single conspiracy was charged did not and could not have prejudiced the [single] defendant by spillover or otherwise."); Sir Kue Chin, 534 F.2d at 1035 ("We have been cited to no case which involves only one defendant and where a claim of multiple conspiracies has been sustained."). Accordingly, courts in the Second Circuit "have consistently found that a 'multiple conspiracies' charge is unnecessary in the trial of a single defendant." United States v. Ulbricht, No. 14-cr-68 (KBF), 2015 WL 413426, at *1 (S.D.N.Y. Feb. 2, 2015) (collecting cases).

The defendant has pointed to no single-defendant conspiracy case where a "multiple conspiracies" charge was required, and the defendant has pointed to no prejudice from the failure to give such a charge where the jury was properly instructed that the Government was required to prove the conspiracy charged in the Indictment. See Dominguez-Gabriel, 511 F. App'x at 19. As in

Ulbricht, "[t]here [was] no risk of any prejudicial spillover because defendant—alleged to be in the center of all the alleged conspiratorial activity—[was] tried alone." 2015 WL 413426, at *2 (denying the defendant's request for a "multiple conspiracies" charge) (internal quotations marks, footnote, and citation omitted). Therefore, the defendant is not entitled to a judgment of acquittal on Count One of the Indictment.

### B.

With respect to Counts Two, Three, and Four, the defendant contends that the Government failed to prove that venue was proper in the Southern District of New York by a preponderance of the evidence. See Dkt. No. 114-1 at 4-5. The defendant argues that the offenses underlying these Counts took place only in Brooklyn, located in the Eastern District of New York, and that the Eastern District of New York was therefore the proper venue for the defendant's trial. Id. at 7.

Counts Two and Three charged the defendant as a principal and an aider and abettor in connection with John's delivery of cash in November and December, 2014, respectively.[2] John traveled from Maryland to Brooklyn by way of the Verrazano-Narrows Bridge. Count Four charged the defendant as a principal and as

---

[2] While John testified that the second delivery occurred in early 2015, the defendant correctly does not argue that the difference in dates was a substantial or material variance from the facts charged in Count Three of the Indictment.

an aider and abettor in connection with Deberry's delivery of cash on March 19, 2015. Deberry traveled from her home in the Bronx to the defendant's business in Brooklyn.

The Sixth Amendment to the Constitution provides that all criminal defendants have the right to a public trial in the "district wherein the crime shall have been committed." U.S. Const. amend. VI; United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). The Government has the burden of proving by a preponderance of the evidence that venue is proper in the district in which the prosecution is brought with respect to each count of the Indictment. Beech-Nut Nutrition Corp., 871 F.2d at 1188.

Each of the three Counts at issue charged the defendant with concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). That statute provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .

> (B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the
location, the source, the ownership, or the control of
the proceeds of specified unlawful activity . . .

[shall be guilty of a crime].

18 U.S.C. § 1956.

A prosecution for violation of § 1956 may be brought in
"any district in which the financial or monetary transaction is
conducted." 18 U.S.C.A. § 1956(i)(1)(A). A "financial
transaction" under § 1956(a)(1) includes "a transaction which in
any way or degree affects interstate or foreign commerce" and
involves "the movement of funds by wire or other means." 18
U.S.C.A. § 1956(c)(4). "Conducting" a financial transaction
within the meaning of § 1956 includes "initiating, concluding,
or participating in initiating, or concluding a transaction." 18
U.S.C.A. § 1956(c)(2). The statute further specifies that:

a transfer of funds from 1 place to another, by wire
or any other means, shall constitute a single,
continuing transaction. And any person who conducts .
. . any portion of the transaction may be charged in
any district in which the transaction takes place.

18 U.S.C.A. § 1956(i)(3).

Each of the transactions at issue in Counts Two, Three, and
Four were "conducted" in part in the Southern District of New
York because each of the couriers --- John and Deberry ---
participated in conducting the transactions by moving the funds
through that district. See § 1956(c)(2). Because the defendant
conducted a portion of the transaction --- particularly by

18

participating in concluding the transaction, which involved the movement of funds --- he could properly be charged under § 1956(i)(3) in any district in which the movement of funds occurred, including the Southern District of New York.

The defendant could also have been charged in the Southern District of New York because each of Counts Two, Three, and Four charged the defendant both as a principal and with aiding and abetting the concealment money laundering. The defendant could thus be charged not only for his substantive role of facilitating the transactions, but also for assisting the couriers in their substantive roles. See 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); United States v. Lange, 834 F.3d 58, 69 (2d Cir. 2016) ("Where guilt of a substantive offense is premised on aiding and abetting, '[v]enue is proper where the defendant's accessorial acts were committed or where the underlying crime occurred . . ..'") cert. denied sub nom. Russell v. United States, 137 S. Ct. 677 (2017), and cert. denied, 137 S. Ct. 685 (2017).

Counts Two and Three relate to John's delivery of cash to the defendant in Brooklyn from Maryland by way of the Verrazano-Narrows Bridge. The Verrazano-Narrows Bridge, spanning a body of water concurrently within the Eastern and Southern Districts of

New York, lies concurrently in both districts. See 28 U.S.C.
§ 112(b). John's transport of the money across the Verrazano–
Narrows Bridge was thus sufficient to lay venue in the Southern
District of New York. See United States v. Shyne, 388 F. App'x
65, 70-71 (2d Cir. 2010) (crossing the Verrazano-Narrows Bridge
would have made venue in the Southern District of New York
proper); United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d
Cir. 1987) (holding that a plane's course of flight over the
Narrows was "sufficient to make venue in the Southern District
proper") (citations omitted).

Venue for Count Four, relating to Deberry's transfer of
cash to the defendant in Brooklyn, which she brought by car from
the Bronx, was also proper in the Southern District of New York
because the Bronx lies within this district. See 28 U.S.C.
§ 112(b).

The defendant urges that the Supreme Court's decision in
United States v. Cabrales, 524 U.S. 1 (1998) dictates a narrow
reading of venue for a money laundering prosecution, such that
the defendant should have been tried in the Eastern District of
New York where he accepted the cash from John and Deberry. See
Dkt. No. 114-1 at 4-8. In Cabrales, a defendant charged with
money laundering "for transactions which began, continued, and
were completed only in Florida," was tried in Missouri, where
the illicit proceeds originated. Cabrales, 524 U.S. at 8

(quotations and citations omitted). The issue decided by the Supreme Court there was whether the money laundering at issue had begun in Missouri. Id. at 7. ("We therefore confront and decide this question: Do those counts charge crimes begun in Missouri and completed in Florida, rendering venue proper in Missouri, or do they delineate crimes that took place wholly within Florida?"). The Supreme Court held that where the defendant acted "after the fact" and the entirety of the transactions at issue occurred in Florida, venue in Missouri was improper. Id. at 8, 10.

Cabrales does not help the defendant. In Cabrales, the Supreme Court made it clear that the transactions at issue occurred solely in Florida. Id. at 8. The Court specifically noted that it was not faced with a case that involved the transportation of funds. Id. By contrast, the substantive counts at issue in this case do involve the transportation of funds. The Court also noted that the defendant in that case was not charged as an aider or abettor in the Missouri drug trafficking offense that was the basis for seeking venue in Missouri. Id. at 7. In this case, the defendant is charged as an aider and abettor, and both John and Deberry transported the funds through the Southern District of New York.

The plain wording of the venue provision of the money laundering statute supports venue for the substantive offenses in the Southern District of New York.

### c.

With respect to Counts Two, Three, and Four, the defendant also argues that the evidence at trial was insufficient to prove the third element of each of those Counts, namely that the defendant knew that the financial transactions at issue were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity (in this case, drug trafficking). See Dkt. No. 114-1 at 8; 18 U.S.C. § 1956(a)(1)(B)(i). Viewing the evidence in the light most favorable to the Government, there was ample evidence from which the jury could have found that the defendant acted with the requisite knowledge.

The evidence showed that the defendant accepted large quantities of cash --- including small denomination bills --- delivered by unknown couriers in plastic bags without any inquiry as to their source. Tr. at 470, 483, 496; see also GX 231-T. The Government offered recorded conversations of the defendant describing that he would meet "scary people," "sometimes late at night" "in some place on the street." GX 231-T. The Government also introduced direct evidence of the defendant's apprehension, for his own safety and his fear of his

possible arrest. See GX 241-T ("when I was given one of the packages, the guy comes out with two steel bars . . . and again I got scared."); GX 231-T ("When the package comes, I'm afraid someone might be following me; I'm afraid that maybe a police officer might knock out [sic] my door; I'm afraid of many things"). Moreover, the jury saw evidence that the defendant deliberately kept the transactions from his boss, GX 231-T, and that he tried to shield his son from participating in them. Tr. at 574. The jury also heard testimony from Ruiz-Flores that, upon learning the nature of the transactions that the defendant was facilitating, he believed that the cash funding the purchases of his Mexican clients' watches was from an illicit source. Tr. at 568. Such evidence gave the jury a sufficient basis to conclude that the defendant knew that the financial transactions underlying Counts Two, Three, and Four were designed, at least in part, to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity.

The defendant argues that he accepted cash in order to facilitate legitimate watch transactions. But that innocent explanation was inconsistent with all of the circumstances of the deliveries of the cash, with the defendant's concealment of the transactions from his boss, with his efforts to shield his

son from involvement in the transactions, and with his acknowledgement that he feared arrest.

Similarly, the jury could also have found that the defendant consciously avoided knowing the purpose of the transactions despite being aware of the high probability of the true purpose of the transactions. The Court properly instructed the jury on conscious avoidance and the defendant has not questioned the accuracy of the charge under Second Circuit law. See Tr. at 1283. There was ample evidence from which the jury could have concluded that the defendant deliberately closed his eyes to what otherwise would have been obvious and acted with a conscious purpose to avoid learning the truth, and that the defendant did not actually believe the contrary to be true. See United States v. Ibarra, 121 F. App'x 879, 880-81 (2d Cir. 2005) ("The government adduced evidence that Ibarra conveyed a large amount of cash between two people he did not know, for a cash commission, and using only a nickname to identify himself. It also adduced evidence that Ibarra had done the same on prior occasions, that he described the people involved as 'dangerous,' and that he admitted knowing that what he was doing was unlawful and that he feared arrest. This evidence amply supports the giving of a conscious avoidance charge as to the requisite knowledge that the aim of the charged conspiracy was to launder the proceeds of a felony offense."); United States v. Svoboda,

347 F.3d 471, 480 (2d Cir. 2003) ("the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct. Moreover, the second prong may be established where, [a] defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge.") (internal citations omitted).

There was ample evidence for the jury to conclude that the defendant was guilty of the substantive offenses charged in Counts Two, Three, and Four of the Indictment.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendant's motion for a judgment of acquittal under Rule 29(c) is **denied.**

SO ORDERED.

Dated:   New York, New York
         October 17, 2017

                                       John G. Koeltl
                            United States District Judge